OPINION OF THE COURT
Mazzarelli, J.P.
Defendant Escape Media Group, Inc. developed, owns and operates an Internet-based music streaming service called Grooveshark. Users of Grooveshark can upload audio files (typically songs) to an archive maintained on defendant’s computer servers, and other users can search those servers and stream recordings to their own computers or other electronic devices. Defendant has taken some measures to ensure that the Groove-shark service does not trample on the rights of those who own copyrights in the works stored on its servers. For example, it is a party to license agreements with several large-scale owners and licensees of sound recordings. In addition, it requires each user, before he or she uploads a work to Grooveshark’s servers, to confirm ownership of the recording’s copyright or license, or some other authorization to share it.
Defendant concedes that it cannot ensure that each work uploaded to its servers is a noninfringing work. However, it has operated Grooveshark with the assumption that it is shielded from infringement claims by copyright owners by 17 USC § 512, *53 popularly known as the Digital Millenium Copyright Act (DMCA). The DMCA, which was enacted in 1998 as an amendment to the Federal Copyright Act, provides “safe harbors” to operators of certain Internet services, including defendant. Defendant relies on the protections delineated in section 512 (c) of the DMCA, which provides:
“(1) In general. — A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—
“(A) (i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
“(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
“(in) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;
“(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and
“(C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.”
Plaintiff UMG Recordings, Inc. is the owner of the rights in many popular sound recordings that have been uploaded to Grooveshark. Many of those recordings were made prior to February 15, 1972[1] (the pre-1972 recordings). That date is significant, because when the Copyright Act was amended in 1971 to *54 include sound recordings, Congress expressly extended federal copyright protection only to recordings “fixed” on February 15, 1972 or after. Indeed, the Act expressly provided that “[w]ith respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this Title until February 15, 2067[2]” (17 USC § 301 [c]). UMG claims in this action that by permitting the pre-1972 recordings to be shared on Grooveshark, defendant infringed on its common-law copyright in those works, and that the DMCA does not apply to those recordings.
In its answer, defendant asserted as its fourteenth affirmative defense that the pre-1972 recordings sat within the safe harbor of section 512 (c) of the DMCA. UMG moved, inter alia, to dismiss that defense pursuant to CPLR 3211 (b). It argued that the DMCA could not apply to the pre-1972 recordings because that would conflict with Congress’s directive in section 301 (c) of the Copyright Act that nothing in the Act would “annul” or “limit” the common-law copyright protections attendant to any sound recordings fixed before February 15, 1972. In response, defendant asserted that nothing in the plain language of the DMCA limited its reach to works fixed after that date. Further, it maintained that a ruling in UMG’s favor would eviscerate the DMCA, insofar as companies like it would still need to expend massive resources policing the works posted on its servers, rather than being able to wait until a copyright holder or licensee notified it that its rights were being infringed.
The motion court denied plaintiff’s motion (37 Misc 3d 208 [2012]). Relying heavily on Capitol Records, Inc. v MP3tunes, LLC (821 F Supp 2d 627 [SD NY 2011]), in which the United States district court tackled precisely the same issue and found that the DMCA embraced sound recordings fixed before February 15, 1972, the court stated that “there is no indication in the text of the DMCA that Congress intended to limit the reach of the safe harbors provided by the statute to just post-1972 recordings” (37 Misc 3d at 215). It agreed with the district court that, although section 301 (c) is an antipreemption provision ensuring that the grant of federal copyright protection did not interfere with common-law or state rights established prior to 1972, that section does not prohibit all subsequent regulation of pre-1972 recordings. The court further noted that, as the district *55 court found, the text of the DMCA does not draw any distinction between federal and state law, and the phrases “copyright owner” and “infringing” found in the DMCA were “applicable to the owner of a common-law copyright, no less than to the owner of a copyright under the Copyright Act” (id. at 214). Further, the court quoted the district court’s observation that
“ ‘the DMCA was enacted to clarify copyright law for internet service providers in order to foster fast and robust development of the internet. Limiting the DMCA to recordings [fixed] after 1972, while excluding recordings before 1972, would spawn legal uncertainty and subject otherwise innocent internet service providers to liability for the acts of third parties. After all, it is not always evident . . . whether a song was recorded before or after 1972’ ” (id. at 215, quoting Capitol Records, Inc., 821 F Supp 2d at 642).
Finally, the court addressed a December 2011 report from the Office of the Register of Copyrights, addressed to the Speaker of the U.S. House of Representatives, recommending that Congress extend federal copyright protection to sound recordings fixed on or before February 15, 1972, and that the safe harbor provisions of section 512 be applicable to such recordings. The motion court acknowledged that the report took the position that Capitol Records, Inc. v MP3tunes, LLC was wrongly decided and that congressional action was necessary before pre-1972 recordings were embraced by the DMCA. Nevertheless, the court concluded that its reading of the DMCA was a reasonable interpretation of what Congress intended.
On appeal, UMG argues that, were the DMCA to be interpreted as protecting services like Grooveshark from infringement liability for pre-1972 recordings, section 301 (c) of the Copyright Act would have been effectively repealed. That is because, it contends, section 301 (c) forbids the Act from “annulling]” or “limiting]” the common-law rights and remedies of owners of such works, and the DMCA, if it were to bar infringement actions against Internet companies that otherwise comply with the DMCA, would do just that. UMG characterizes section 301 (c) as creating “reverse pre-emption” of state law copyright remedies, meaning that Congress is not permitted to trample on the state of copyright laws in any way.
UMG further argues that the motion court ignored the DMCA’s provision that a copyright infringer is, for purposes of *56 the legislation, “[a]nyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122” (17 USC § 501 [a]). It contends that, because each of those sections refers to works which were fixed after February 15, 1972 and so are unquestionably covered by the Copyright Act, a “copyright infringer” entitled to the protections of the DMCA is by definition not entitled to protection with respect to works fixed before that date. As further evidence that Congress intended the DMCA only to apply to post-1972 works, UMG notes that section 512 (c) of the statute refers to a work’s “copyright owner,” which is defined by the Act as the owner of “any one of the exclusive rights comprised in a copyright” (17 USC § 101). UMG then refers to the Senate and House reports that accompanied the Copyright Act, which stated that those exclusive rights were the ones delineated in section 106 of the Act.
Finally, UMG points to the report of the United States Copyright Office, which was commissioned by Congress as part of its investigation into extending the Copyright Act to pre-1972 recordings. It stresses that the report concluded that the DMCA does not currently apply to such works, and that Capitol Records, Inc. v MP3tunes, LLC, upon which the motion court so heavily relied, was premised on “highly questionable grounds.”
Defendant argues that there is no tension between the DMCA and section 301 (c) of the Copyright Act. It contends that any references in the DMCA to “copyrights” and “infringements” thereof are generic, and that there is no indication that Congress intended to limit the statute’s reach to works covered by the Copyright Act. It further claims that had Congress intended only to protect companies such as defendant from claims by owners of federal copyright claims, it would have so stated.
Defendant maintains that if UMG’s interpretation of the DMCA were adopted, that act would be eviscerated. It points to legislative history stating that the purpose behind the DMCA was to promote efficiency in Internet operations, and argues that Grooveshark, and other Internet companies that provide similar services such as YouTube and Google, would become inefficient if they had to research the provenance of works before permitting them to be posted to their sites. Defendant additionally argues that the DMCA does not annul or limit any of UMG’s rights in the pre-1972 recordings, because, notwithstanding the DMCA’s safe harbor provisions, UMG still retains its common-law rights in those works, such as the ability to exploit the works, license them and create derivative works.
*57 Finally, defendant downplays the significance of the Copyright Office report. It argues that the Copyright Office is managed by a political appointee and so is entitled to little deference. Further, it questions the logic behind the report’s conclusion that Capitol Records, Inc. v MP3tunes, LLC was wrongly decided.
In interpreting any statute, we are required, first and foremost, to pay heed to the intent of the legislature, as reflected by the plain language of the text (see Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]). In addition,
“[i]n construing statutes, it is a well-established rule that resort must be had to the natural signification of the words employed, and if they have a definite meaning, which involves no absurdity or contradiction, there is no room for construction and courts have no right to add to or take away from that meaning” (id. [internal quotation marks omitted]).
Repeal or modification of a statute by implication is disfavored (Matter of Consolidated Edison Co. of N.Y. v Department of Envtl. Conservation, 71 NY2d 186, 195 [1988]).
“ ‘Generally speaking, a statute is not deemed to repeal an earlier one without express words of repeal, unless the two are in such conflict that both cannot be given effect. If by any fair construction, a reasonable field of operation can be found for two statutes, that construction should be adopted’ ” (People v Newman, 32 NY2d 379, 390 [1973], cert denied 414 US 1163 [1974], quoting Matter of Board of Educ. of City of N.Y. v Allen, 6 NY2d 127, 141-142 [1959]).
“These principles apply with particular force to statutes relating to the same subject matter, which must be read together and applied harmoniously and consistently. Moreover, as to statutes enacted in a single legislative session, there is a presumption against implied repeal; the Legislature would hardly repeal a fresh enactment without doing so expressly” (Alweis v Evans, 69 NY2d 199, 204-205 [1987] [citations omitted]).
Initially, it is clear to us that the DMCA, if interpreted in the manner favored by defendant, would directly violate section 301 (c) of the Copyright Act. Had the DMCA never been enacted, there would be no question that UMG could sue defendant in *58 New York state courts to enforce its copyright in the pre-1972 recordings, as soon as it learned that one of the recordings had been posted on Grooveshark. However, were the DMCA to apply as defendant believes, that right to immediately commence an action would be eliminated. Indeed, the only remedy available to UMG would be service of a takedown notice on defendant. This is, at best, a limitation on UMG’s rights, and an implicit modification of the plain language of section 301 (c). The word “limit” in 301 (c) is unqualified, so defendant’s argument that the DMCA does not contradict that section because UMG still retains the right to exploit its copyrights, to license them and to create derivative works, is without merit. Any material limitation, especially the elimination of the right to assert a common-law infringement claim, is violative of section 301 (c) of the Copyright Act.
For defendant to prevail, we would have to conclude that Congress intended to modify section 301 (c) when it enacted the DMCA. However, applying the rules of construction set forth above, there is no reason to conclude that Congress recognized a limitation on common-law copyrights posed by the DMCA but intended to implicitly dilute section 301 (c) nonetheless. Again, such an interpretation is disfavored where, as here, the two sections can reasonably coexist, each in its own “field of operation” (People v Newman, 32 NY2d at 390). Congress explicitly, and very clearly, separated the universe of sound recordings into two categories, one for works “fixed” after February 15, 1972, to which it granted federal copyright protection, and one for those fixed before that date, to which it did not. Defendant has pointed to nothing in the Copyright Act or its legislative history which prevents us from concluding that Congress meant to apply the DMCA to the former category, but not the latter.
To the contrary, reading the Copyright Act as a whole, which we are required to do (see Matter of New York County Lawyers’ Assn. v Bloomberg, 19 NY3d 712, 721 [2012]), it is reasonable to interpret the references in the DMCA to “copyright” or “copyright infringers” as pertaining only to those works covered by the DMCA. The DMCA expressly identifies the rights conferred by the Copyright Act in stating who a “copyright infringer” is for purposes of the DMCA. Had Congress intended to extend the DMCA’s reach to holders of common-law rights it would have not have provided so narrow a definition. Defendant’s argument that by not affirmatively excluding works not otherwise covered by the Act, Congress was implicitly including them, is simply unreasonable, and contrary to the maxim ex- *59 pressio unius est exclusio alterius, which dictates that the specific mention of one thing implies the exclusion of others (see Matter of Mayfield v Evans, 93 AD3d 98, 106 [1st Dept 2012], citing McKinney’s Cons Laws of NY, Book 1, Statutes § 240).
Moreover, in the same Congressional session as it enacted the DMCA (indeed one day before), Congress amended section 301 (c) of the Copyright Act to extend for an additional 20 years the amount of time before the Act could be used to “annul” or “limit” the rights inherent in pre-1972 recordings. Thus, Congress was acutely aware that the DMCA could be used to modify 301 (c) in the way advocated by defendant, and so, in the absence of language expressly reconciling the two provisions, there is an even stronger presumption that it did not intend for the DMCA to do so (see Alweis v Evans, 69 NY2d at 204-205). We make this determination based strictly on the plain language and context of the statute and its legislative histoiy, and so we need not decide whether the report by the Copyright Office, which reaches the same conclusion, has any authoritative effect.
Finally, we reject defendant’s argument that the very purpose of the DMCA will be thwarted if it is deemed not to apply to the pre-1972 recordings. The statutory language at issue involves two equally clear and compelling Congressional priorities: to promote the existence of intellectual property on the Internet, and to insulate pre-1972 sound recordings from federal regulation. As stated above, it is not unreasonable, based on the statutory language and the context in which the DMCA was enacted, to reconcile the two by concluding that Congress intended for the DMCA only to apply to post-1972 works. In any event, defendant’s concerns about interpreting the statutes in the manner advocated by UMG are no more compelling than UMG’s concerns about interpreting the statutes in the manner advanced by defendant. Under such circumstances, it would be far more appropriate for Congress, if necessary, to amend the DMCA to clarify its intent, than for this Court to do so by fiat.
Accordingly, the order of the Supreme Court, New York County (Barbara R. Kapnick, J.), entered July 10, 2012, which, insofar as appealed from, denied plaintiffs motion to dismiss defendant’s fourteenth affirmative defense, should be reversed, on the law, with costs, and the motion granted.
Renwick, Richter, Gische and Clark, JJ., concur.
Order, Supreme Court, New York County, entered July 10, 2012, reversed, on the law, with costs, and the motion granted.

. Indeed, many of the recordings at issue are iconic, including songs from the early days of rock and roll, such as “Peggy Sue” by Buddy Holly and “Johnny B. Goode” by Chuck Berry, and Motown classics like “My Girl” by the Temptations and “Baby Love” by the Supremes, to name but a few of the legendary songs to which UMG owns the copyright.

. Originally the pre-1972 recordings were set to come within the Act’s coverage in 2047, but that date was extended by Congress in 1998.