Filed 5/14/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| DIGITAL MUSIC NEWS LLC, | B242700 |
| Petitioner, | (Los Angeles County Super. Ct. No. SS022099) |
| v. | |
| SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| ESCAPE MEDIA GROUP, LLC, | |
| Real Party in Interest. | |

Petition for extraordinary writ. Richard Stone, Judge. Petition is granted.

McKenna Long & Aldridge, Charles A. Bird; Public Citizen Litigation Group, Paul Alan Levy; Micah Gabriel Katz for Petitioner.

No appearance for Respondent.

McPherson Rane, Edwin F. McPherson and Pierre B. Pine; Rosenberg & Giger, John J. Rosenberg for Real Party in Interest.

_____

Escape Media Group (Escape) operates an Internet service called Grooveshark through which users may upload and retrieve digital music files. UMG Recordings, Inc. owns an extensive music catalog that includes songs by such artists as Buddy Holly, The Jackson 5, Marvin Gaye, and The Who. In 2010, UMG sued Escape in the Supreme Court of the State of New York, alleging Escape infringed on copyrights afforded by New York common law by reproducing user-uploaded, copyrighted sound recordings, storing them on its servers, and distributing copies to other users, to its own profit. Escape denied liability, asserting its conduct was permissible under federal copyright law.

Digital Music News (Digital) publishes the online newsletter *Digital Music News*, which focuses on the digital music industry. In 2011, *Digital Music News* reported that a music artist unaffiliated with UMG had also accused Escape of copyright infringement.

The article was followed by approximately 100 reader comments, two of which are of interest here. In them, a reader identified only as "Visitor" represented he or she was an Escape employee and routinely received "direct orders from the top" to upload music to its servers, where it was stored and made available to third party users and never removed, even if artists or music labels complained.

Under the auspices of the Supreme Court of the State of New York, County of New York, Escape served a subpoena on Digital (which is not a party to the litigation between UMG and Escape), seeking Visitor's identity. When Digital refused to comply, Escape petitioned the Los Angeles Superior Court pursuant to the Interstate and International Depositions and Discovery Act, Code of Civil Procedure section 2029, et seq., for enforcement. The court ordered Digital to comply with the subpoena, from which order Digital now appeals.

Digital argues information identifying Visitor will not reasonably lead to the discovery of admissible evidence in the New York lawsuit and is protected by Visitor's right to privacy. We agree with both contentions, and will therefore issue a writ of mandate directing the trial court to vacate its order enforcing Escape's subpoena.

2

## Statement of Facts

### 1. The New York Lawsuit

Grooveshark enables third party users to upload, share, download and stream files containing audio recordings. On January 6, 2010, UMG sued Escape in New York state court for state common law copyright infringement and unfair competition, alleging Escape enabled and encouraged Grooveshark users to upload unauthorized copies of UMG's recordings to Grooveshark, which Escape then copied to its servers and subsequently distributed to other Grooveshark users. (*UMG Recordings v. Escape Media Group* (Supreme Ct. New York County, 2010, No. 100152).)[1]

Escape denied the allegations and asserted a number of affirmative defenses and counterclaims. Among other defenses, Escape claimed immunity under the Digital Millennium Copyright Act (DMCA), which shields from federal copyright infringement liability an Internet service provider that hosts solely third party user materials, so long as it promptly removes copyrighted materials when it becomes aware of the infringement.[2] (17 U.S.C. § 512(a)-(c).) On April 23, 2013, this defense was ordered stricken by the Appellate Division of the Supreme Court of New York on the ground that DMCA affords immunity only against federal copyright claims, not state common law claims. (*UMG Recs., Inc. v. Escape Media Group, Inc*. (N.Y. App.Div. 1st Dep't 2013) 107 A.D.3d 51, 59.) In its answer, Escape also asserted counterclaims for interference with Escape's

---

[1] In its state lawsuit, UMG sought redress only as to recordings created prior to February 15, 1972. This is because the Copyright Act of 1976, title 17 United States Code section 101, et seq., expressly preempts state law copyright protections on material recorded on or after February 15, 1972. (17 U.S.C. § 301(a) & (c).)

[2] Title II of the DMCA, the Online Copyright Infringement Liability Limitation Act, 17 U.S.C. § 512, et seq., creates a safe harbor for an online service provider against copyright infringement liability if the provider meets specified requirements, one of which is the provider must promptly block access to alleged infringing material or remove the material from its systems when it receives notification of an infringement claim from a copyright holder.

3

contracts, interference with its business relations, and anti-competitive conduct, alleging UMG caused other companies to end their business relationships with Escape.[3]

In October 2011, *Digital Music News* reported on an email exchange between Escape executives and a member of a rock band who had complained that Grooveshark illegally hosted the band's copyrighted recordings and refused to take them down. In the comments section of this article, Visitor claimed to "work for Grooveshark" and stated "the administration" required employees to upload files to the Grooveshark database, which contradicted Escape's claim that it hosted solely third party recordings as permitted by the DMCA. The next day, Visitor[4] commented that although Grooveshark administrators purported to remove copyrighted music when record labels and artists complained, the music was not actually deleted but merely put on "backup," to be made available at a later time, when the complaining party's attention turned elsewhere.

---

[3] We deny Digital's request for judicial notice of copyright infringement lawsuits brought against Escape by other music companies, as these cases are irrelevant to the issues before us. (See *Arce v. Kaiser Found. Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482 ["We also may decline to take judicial notice of matters that are not relevant to dispositive issues on appeal"].)

[4] It is possible the anonymous comments were written by two different authors. Because the parties assume one author wrote both comments, we will also.

Visitor stated the music was in fact never deleted: "[T]o confirm the fears of [complaining musicians], there is no way in hell you can get your stuff down." [5]

## 2.       The Subpoena and Enforcement

On January 9, 2012, Escape served Digital with a subpoena in the New York action for the production of business records, seeking information concerning Visitor's identity and communications between Digital and UMG concerning, or documents relating to, Escape, Grooveshark, or the October 2011 *Digital Music News* article. Digital objected to the subpoena and notified Escape that any information about Visitor's

---

[5] On October 17, 2011, Visitor said: "I work for [Escape]. Here is some information from the trenches: [¶] We are assigned a predetermined amount of weekly uploads to the system and get a small extra bonus if we manage to go above that (not easy). The assignments are assumed as direct orders from the top to the bottom, we don't just volunteer to 'enhance' the . . . database. [¶] All search results [user searches of the database] are monitored and when something is tagged as 'not available', it get's [*sic*] queued up to our lists for upload. You have to visualize the database in two general sections: 'known' stuff and 'undiscovered/indie/underground'. The 'known' stuff is taken care internally by uploads. Only for the 'undiscovered' stuff are the users involved as explained in some posts above. Practically speaking, there is not much need for users to upload a major label album since we already take care of this on a daily basis. [¶] Are the above legal, or ethical? Of course not. Don't reply to give me a lecture. I know. But if the labels and their laywers [*sic*] can't figure out how to stop it, then I don't feel bad for having a job. It's tough times. [¶] Why am I disclosing all this? Well, I have been here a while and I don't like the attitude that the administration has aquired [*sic*] against the artists. They are the enemy. They are the threat. The things that are said internally about them would make you very very angry. Interns are promised getting a foot in the music industry, only to hear these people cursing and bad mouthing the whole industry all day long, to the point where you wonder what would happen if [the Web site] gets hacked by Anonymous one day and all the emails leak on some torrent or something. [¶] And, to confirm the fears of the members of [the complaining music artist], there is no way in hell you can get your stuff down. They are already tagged since you sent in your first complaint. The administration knows that you can't afford to sue for infringement."

On October 18, 2011, Visitor said: "Just because you can't see an album available right now, doesn't mean it's not sitting quietly in the background. It is policy to put albums on 'backup', when they have to be taken down due to a [copyright claim], to chill things out with the labels and what not. The albums are not deleted, if that's what you guys think."

identity had been deleted as part of Digital's routine business practice of periodically overwriting data.

On March 20, 2012, Escape petitioned the Los Angeles County Superior Court to enforce the subpoena under the Interstate and International Depositions and Discovery Act, Code of Civil Procedure section 2029 et seq.[6]  Digital opposed the petition, arguing the subpoena was moot because any information that would identify Visitor had been overwritten, enforcement of the subpoena would infringe on the First Amendment rights of Digital and Visitor, and disclosure would violate California's journalist shield law (Cal. Const., art. I, § 2, subd. (b); Evid. Code, § 1070).[7]  In reply, Escape argued Digital had no basis for refusing to comply with the subpoena because the First Amendment does not protect false and defamatory anonymous speech.

Although Digital denied any discoverable material remained on its servers, the trial court found a possibility existed that fragmented data identifying Visitor might yet be retrieved.  The court also found Escape established a prima facie case that Visitor's comments were libelous, and thus unprotected by the First Amendment.  The court concluded Visitor's identity was therefore discoverable and ordered Digital to comply with the subpoena.[8]

The trial court subsequently issued a supplemental order addressing the compliance process.  The court ordered Escape to purchase and provide Digital with a

---

[6] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

[7] On appeal, Digital has abandoned its argument under California's journalist shield law.

[8] The court ordered Digital to produce:  "[A]ny and all business records (including, without limitation, e-mail files, databases, logs of activity on computer systems and/or content and information contained within the [Digital] website or administrative panel, or any backup copies of the data from within either) that [Digital] has concerning the" first and second anonymous comments, or its author, the person identified by the pseudonym Visitor.  The court's order did not address the portion of the subpoena seeking communications and/or documents concerning Escape, Grooveshark, or the October 2011 *Digital Music News* article.  Escape has not pursued that discovery.

backup server, and ordered Digital to preserve a virtual machine image of its server on the backup server and make the image available to a third party forensic examiner under court supervision. The examiner would first indicate to Digital whether any identifying information was present and then reveal such information to Escape if directed to do so by the court. Escape would pay all expenses related to the data preservation and inspection. Once the inspection was complete, the backup server would be expunged of any material.[9]

Digital timely appealed both orders and we issued a writ of supersedeas staying discovery. Pursuant to our request, the parties submitted supplemental letter briefs addressing whether section 2017.010 and the California Constitution's right of privacy preclude discovery of Visitor's identity.

## Discussion

### 1. Standard of Review

Pursuant to the Interstate and International Depositions and Discovery Act, a party to a proceeding in a foreign jurisdiction may obtain discovery in California by retaining a local attorney to issue a subpoena. (§ 2029.350.) If a dispute arises relating to the subpoena, any party may petition the superior court where the discovery is to be conducted for a protective order or an order enforcing, quashing, or modifying the subpoena. (§ 2029.600.) Such an order may be reviewed only by petition to the Court of Appeal for an extraordinary writ. (§ 2029.650, subd. (a).) Although Digital filed an appeal here, we deem the appeal to be a writ petition.

A discovery order is reviewed under the deferential abuse-of-discretion standard. (*Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154, 1161.) An appellate court may reverse a trial court decision for abuse of discretion when the trial court "applies the wrong legal standards applicable to the issue at hand." (*Doe 2 v. Superior Court* (2005) 132 Cal.App.4th 1504, 1517.)

---

[9] Currently, Digital has transferred a virtual machine image of its server to the backup server provided by Escape, but no other action has been taken.

**2.     California discovery law prohibits disclosure of Visitor's identity**

Although discovery sought under the Interstate and International Depositions and Discovery Act is intended for use in a foreign jurisdiction, it is nevertheless governed by California's Civil Discovery Act, section 2016.010 et seq. (§ 2029.500.) Section 2017.010 of that act sets forth the permissible scope of discovery in California: "[A]ny party may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action . . . if the matter either is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence." (§ 2017.010.) A party may also obtain discovery of "the identity and location of persons having knowledge of any discoverable matter, as well as of the existence, description, nature, custody, condition, and location of any document [or] electronically stored information . . . ." (*Ibid.*)

An appellate court may reverse a trial court's grant of discovery if it concludes the information sought "cannot as a reasonable possibility lead to the discovery of admissible evidence or be helpful in preparation for trial." (*Forthmann v. Boyer* (2002) 97 Cal.App.4th 977, 988-989.) Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is that which has a "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

"Although the scope of civil discovery is broad, it is not limitless." (*Calcor Space Facility, Inc. v. Superior Court* (1997) 53 Cal.App.4th 216, 223.) Discovery devices must "be used as tools to facilitate litigation rather than as weapons to wage litigation." (*Id.* at p. 221.) A party seeking to compel discovery must therefore "set forth specific facts showing good cause justifying the discovery sought." (§ 2031.310, subd. (b)(1); see *Calcor Space Facility, Inc. v. Superior Court*, *supra*, 53 Cal.App.4th at p. 223.) To establish good cause, a discovery proponent must identify a disputed fact that is of consequence in the action and explain how the discovery sought will tend in reason to prove or disprove that fact or lead to other evidence that will tend to prove or disprove the fact.

8

The facts of consequence in the New York lawsuit between UMG and Escape may be found in UMG's complaint and Escape's affirmative defenses and counterclaims.

In the New York lawsuit, UMG alleges Escape infringed on its common law copyrights and engaged in unfair competition. "A copyright infringement cause of action in New York consists of two elements: (1) the existence of a valid copyright; and (2) unauthorized reproduction of the work protected by the copyright." (*Capitol Records, Inc. v. Naxos of Am., Inc.* (2005) 4 N.Y.3d 540, 563.) A cause of action for unfair competition predicated on copyright infringement, "in addition to unauthorized copying and distribution requires competition in the marketplace or similar actions designed for commercial benefit [citations], or deception of the public [citation]." (*Id.* at pp. 563-564.) UMG alleges Escape "enables and encourages its users to upload digital copies" of UMG's recordings to Grooveshark, then copies those recordings to its servers and distributes them to other users. By doing so, Escape infringes on UMG's copyrights and unfairly competes with UMG for commercial benefit.

In its answer, Escape denies the allegations and contends its conduct is permitted under the DMCA. Title II of that act provides in pertinent part: "A service provider shall not be liable . . . for infringement of copyright by reason of" transmission or storage of transitory digital information so long as the transmission or storage is done "at the direction of a person other than the service provider," is "carried out through an automatic technical process without selection of the material by the service provider," and does not result in copies of the material being maintained on the system or network "for a longer period than is reasonably necessary for the transmission." (17 U.S.C. § 512(a) & (b).) To enjoy this immunity, a service provider who becomes aware of infringing material on its network must "respond[] expeditiously to remove, or disable access to, the material." (17 U.S.C. § 512(c)(1)(C).) As stated above, Escape's DMCA defense was ordered stricken by the appellate division of the New York Supreme Court.

Escape also counterclaims for interference with its contracts and business relations and anti-competitive conduct. Under New York law, "[t]o sustain a claim for tortious interference with a contract, it must be established that a valid contract existed which a

9

third party knew about, the third party intentionally and improperly procured the breach of the contract[,] and the breach resulted in damage to the plaintiff." (*Ullmannglass v. Oneida, Ltd.* (2011) 927 N.Y.S.2d 702, 705.) Where there has been no breach of an existing contract, but only interference with prospective contract rights, the plaintiff must show the defendant's conduct amounted to a crime or an independent tort. (*Carvel Corp. v. Noonan* (2004) 3 N.Y.3d 182, 190.) Escape alleges UMG has engaged in a "legal jihad" in which it coerces third party companies to breach their contracts with Escape and terminate beneficial relationships, the goal being "to destroy Escape by cutting off [its] sources of revenue."

It was not readily apparent to us how the identity of Visitor, who, similar to UMG, claimed Escape routinely violated copyrights on sound recordings, would lead to admissible evidence refuting UMG's allegations or supporting Escape's defenses or counterclaims. We therefore asked Escape to explain in a supplemental brief how discovery of Visitor's identity was reasonably calculated to lead to the discovery of admissible evidence.

Escape first states without elaboration that Visitor's identity is "most assuredly" relevant to Escape's DMCA defense. This is a conclusion, not an explanation, much less a showing of specific facts demonstrating discovery of Visitor's identity is reasonably calculated to lead to admissible evidence. To establish its DMCA defense Escape would have had to prove, among other things, that it removes copyrighted material when informed of an infringement. Escape fails to explain how the identity of Visitor—who claims the opposite—would lead to evidence supporting the defense.

In any event, Escape's DMCA defense was ordered stricken by the Appellate Division of the New York State Supreme Court, which held the defense immunizes a service provider only from federal copyright claims, not state common law claims such as those at issue here. The defense therefore raises no currently disputed "fact that is of consequence to the determination of the action" (Evid. Code, § 210), rendering Visitor's comments irrelevant.

10

Escape insists that the viability of its DMCA defense "is far from resolved with either finality or certainty," because in *Capitol Records v. Vimeo* (S.D.N.Y. Dec. 31, 2013) 2013 U.S.Dist. Lexis 181882 (*Vimeo*), the United States District Court for the Southern District of New York certified an interlocutory appeal on the DMCA immunity issue to the United States Court of Appeals for the Second Circuit. But this merely establishes the possibility that Escape's DMCA defense might someday be reinstated—assuming the Second Circuit accepts the *Vimeo* appeal, and rules DMCA immunity applies to state common law claims, and Escape moves on that basis to reinstate its DMCA defense, and the New York Supreme Court grants the motion. Speculation about a remote-in-time possibility does not constitute reasonable calculation that discovery will lead to evidence concerning a fact currently in dispute.

Escape next argues Visitor's comments are relevant to any claim by UMG that Escape may be secondarily liable for infringement of UMG's copyrights. Escape argues it must identify Visitor "as a predicate to exposing the Anonymous Comments as false," which will refute any allegation that Escape knew about or supervised direct infringement of UMG's copyrights by Escape employees.

The argument is meritless. First, UMG makes no allegation pertaining to secondary liability based on the conduct of Escape's employees. Rather, it alleges Escape enables Grooveshark *users* to upload music, which is then copied, stored, and distributed to other users. "Relevant evidence" means evidence "having any tendency in reason to prove or disprove any *disputed fact* that is of consequence to the determination of the action." (Evid. Code, § 210, italics added.) Escape's operation of Grooveshark in the manner UMG alleges is not in dispute, as Escape expressly admitted the practice in its answer. The only issue is whether the practice violates UMG's copyrights, which is a

11

question of law, not fact. Although Escape contends Visitor's comments are untrue, that out-of-court quarrel is of no consequence to the determination of UMG's lawsuit.[10]

Even if UMG had alleged—perhaps in response to Escape's now-defunct DMCA defense—that Escape employees personally uploaded copyrighted music to Grooveshark's database and refused to take it down when asked, Escape still fails to explain how discovery of Visitor's identity would tend in reason to lead to evidence disproving UMG's allegation. Visitor said two things of consequence: (1) He/she is an Escape employee; and (2) Escape administrators encouraged employees to infringe on copyrights. Escape apparently believes disproving one or both of these out-of-court claims would somehow disprove UMG's allegations. We fail to see how. Even if Escape were able to show Visitor lacked evidence to support his or her claims—for example by showing Visitor was not in fact an Escape employee or was motivated by mischief or spite—such a showing would have no tendency in reason to prove UMG lacked evidence supporting its allegations. If Escape proposes to demonstrate affirmatively that its practices are not as Visitor described, Visitor's identity would be unnecessary to such a proof. In either case, Visitor's identity has no tendency in reason to prove or disprove any disputed fact of consequence to the action, and is not reasonably calculated to lead to such proof.

Escape argues Visitor's identity "would obviously be germane" to its counterclaims for interference with business relations if, as Escape has long suspected, Visitor's comments were planted by UMG. The argument is without merit.

In its counterclaims, Escape alleges that in *2010*, UMG contacted Hewlett Packard, INgrooves (a digital music distribution company), Apple iStore, Google, and MusicAds (a Madrid, Spain company that sells ad space on Web sites) and dissuaded them from doing business with Escape. Nothing in the record suggests Escape's

_____

[10] Nothing in the record suggests UMG will rely on Visitor's assertion that Escape employees uploaded music to Grooveshark's database, to support either of its causes of action. In fact, in response to Escape's discovery request, UMG indicated it possessed no information related to Visitor's identity.

12

counterclaims pertain in any way to Visitor's *2011* comments on the *Digital Music News* Web site or that those comments caused third party companies to end business relationships or terminate contracts with Escape. Moreover, Escape offers no explanation supporting its belief that Visitor might be associated with UMG. Escape's argument that Visitor is a UMG plant rests on pure speculation, not reasonable calculation.

Finally, Escape argues Visitor's identity is relevant to a federal lawsuit in which UMG specifically references Visitor's comments to bolster its allegation that Escape engaged in copyright infringement. In 2011, UMG and several other record labels filed a lawsuit in the Southern District of New York against Escape for violation of federal copyright laws.[11] (*Arista Music v. Escape Media Group* (S.D.N.Y. 2011, No. 8407).) For reasons discussed above, we suspect Visitor's identity would be irrelevant even in that lawsuit, as an anonymous comment on the Internet is nugatory both as a matter of pleading and of proof, and would not rise to the status of a disputed fact until such time as the plaintiff attempts to call Visitor into court. At any rate, allegations in another lawsuit are of no consequence to the determination of this action.

In sum, Visitor's identity is not reasonably calculated to lead to the discovery of admissible evidence in the underlying lawsuit between UMG and Escape.

### 3. Visitor's privacy interests outweigh Escape's need for disclosure

Even if Visitor's identifying information was reasonably calculated to lead to admissible evidence, his or her right to privacy under the California Constitution would outweigh Escape's need for the information.[12] "The right to speak anonymously draws its strength from two separate constitutional wellsprings: the First Amendment's freedom

---

[11] We deny Digital's request for judicial notice of memoranda of law relating to Escape's motion to dismiss in this federal case. As the subpoena in the case before us arises out of UMG's lawsuit against Escape in New York state court, these memoranda are irrelevant.

[12] Digital possesses standing to assert Visitor's constitutional rights. (See *Rancho Publications v. Superior Court* (1999) 68 Cal.App.4th 1538, 1541 [a non-party "to civil litigation (such as a newspaper) [may] assert the constitutionally protected rights of an author to remain unknown"].)

13

of speech and the right of privacy in article I, section 1 of the California Constitution." (*Rancho Publications v. Superior Court*, *supra*, 68 Cal.App.4th at pp. 1540-1541.) The California Constitution provides that all people have a right of privacy. (Cal. Const., art. I, § 1.) This express right is broader than the implied federal right to privacy. (*American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 326.) The California privacy right "protects the speech and privacy rights of individuals who wish to promulgate their information and ideas in a public forum while keeping their identities secret," and "limits what courts can compel through civil discovery." (*Rancho Publications v. Superior Court*, *supra*, 68 Cal.App.4th at pp. 1547-1548.)

Both California courts and federal courts have recognized the value in extending the protections afforded anonymous speech to speech made via the Internet. (See generally *Reno v. ACLU* (1997) 521 U.S. 844, 870; *Krinsky v. Doe 6*, *supra*, 159 Cal.App.4th 1154.) "The use of a pseudonymous screen name offers a safe outlet for the user to experiment with novel ideas, express unorthodox political views, or criticize corporate or individual behavior without fear of intimidation or reprisal. In addition, by concealing speakers' identities, the online forum allows individuals of any economic, political, or social status to be heard without suppression or other intervention by the media or more powerful figures in the field." (*Krinsky v. Doe 6*, *supra*, 159 Cal.App.4th at p. 1162.) "The 'ability to speak one's mind' on the Internet 'without the burden of the other party knowing all the facts about one's identity can foster open communication and robust debate.'" (*Doe v. 2TheMart.com Inc.* (2001) 140 F.Supp.2d 1088, 1092.)

"[W]hen the constitutional right of privacy is involved, the party seeking discovery of private matter must do more than satisfy the section 2017[.010] standard. The party seeking discovery must demonstrate a compelling need for discovery, and that compelling need must be so strong as to outweigh the privacy right when these two competing interests are carefully balanced." (*Lantz v. Superior Court* (1994) 28 Cal.App.4th 1839, 1853-1854; see also *Planned Parenthood Golden Gate v. Superior Court* (2000) 83 Cal.App.4th 347, 367 [courts must balance the privacy interests of the person subject to discovery against the litigant's need for discovery].) A discovery

14

proponent may demonstrate compelling need by establishing the discovery sought is directly relevant and essential to the fair resolution of the underlying lawsuit.  (*Planned Parenthood Golden Gate v. Superior Court*, *supra*, 83 Cal.App.4th at p. 367; *Johnson v. Superior Court* (2000) 80 Cal.App.4th 1050, 1071.)

Applying this balancing test we conclude Visitor's privacy interest outweighs Escape's need to discover his or her identity.  That interest begins with Visitor's need for a venue from which to be heard without fear of interference or suppression.  Visitor's anonymity also frees him or her from fear of retaliation, an even more compelling interest if Visitor truly is an Escape employee, as represented, because exposure could endanger not only his or her privacy but also livelihood.

On the other hand, Escape's need for the discovery is practically nonexistent.  If Visitor is not an Escape employee, his or her opinion about Grooveshark not only lacks foundation but would be undermined by Visitor's misrepresentation concerning employment, and would therefore be of little or no probative value in this or any litigation.  And as discussed above, Visitor's comments, even if made by an employee, are only tangentially related to UMG's lawsuit, as Visitor makes allegations UMG does not make and undermines a defense Escape is now barred from raising.

In no sense is Visitor's identity essential to a fair resolution of the UMG lawsuit.  This is not a case where the veil of anonymity must be drawn aside to afford a victim redress for the anonymous speaker's defamation (*Krinsky v. Doe 6*, *supra*, 159 Cal.App.4th at pp. 1666-1667, 1173), obscenity (*Roth v. United States* (1957) 354 U.S. 476, 483), libel (*Beauharnais v. Illinois* (1952) 343 U.S. 250, 266), copyright infringement (*Harper & Row, Publishers, Inc. v. Nation Enterprises* (1985) 471 U.S. 539, 555-556), misleading or commercial speech (*Central Hudson Gas & Electric Corp. v. Public Service Comm'n* (1980) 447 U.S. 557, 563-564), or use of 'fighting words' (*Chaplinsky v. New Hampshire* (1942) 315 U.S. 568, 573).  Visitor has done nothing more than provide commentary about an ongoing public dispute in a forum that could hardly be more obscure—the busy online comments section of a digital trade newspaper.  Such commentary has become ubiquitous on the Internet and is widely perceived to carry

15

no indicium of reliability and little weight.  We will not lightly lend the subpoena power of the courts to prove, in essence, that *Someone Is Wrong On The Internet.*

Given our holdings above, we decline to address Digital's argument that routinely deleted data controlled by a non-party cannot be subject to forensic examination under the principles of electronic discovery.

## Disposition

The petition for writ of mandate is granted.  The trial court is directed to vacate its order granting Escape's petition to enforce the subpoena and to enter a new order denying the petition.  The writ of supersedeas is dissolved.  Digital is to recover its costs on appeal.

CERTIFIED FOR PUBLICATION

CHANEY, J.

We concur:

ROTHSCHILD, Acting P. J.

JOHNSON, J.

16